

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**ENTERED**
**03/11/2011**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **ROYCE HOMES, LP** | § | Case  No. 09-32467-H4-7 |
| | § | |
| **DEBTOR** | § | **(Chapter 7)** |
| | § | |

**MEMORANDUM OPINION REGARDING TRUSTEE'S MOTION TO COMPEL**
**PRODUCTION OF DOCUMENTS CLAIMED AS PRIVILEGED BY JOHN SPEER**
[Docket No. 306]

## I. INTRODUCTION

This Memorandum Opinion concerns the attorney-client privilege—the first common law privilege to protect confidential communications between clients and their attorneys.  At stake is the disclosure of thousands of e-mails exchanged between a key decision-maker of a once successful residential home building entity and his attorneys.

On January 28, 2011, this Court made Findings of Fact and Conclusions of Law orally on the record.  This Memorandum Opinion memorializes these Findings and Conclusions.  To the extent that any of the oral Findings and Conclusions conflict with any of the written Findings and Conclusions set forth herein, the latter should govern.  To the extent that the written Findings and Conclusions do not encompass all of the oral Findings and Conclusions, then those oral Findings and Conclusions which are not covered are hereby incorporated as supplemental Findings and Conclusions.

1

## II. FINDINGS OF FACT

1. On April 7, 2009 (the Petition Date), four creditors of Royce Homes, LP (the Debtor)[1]—Wisenbaker Builder Services, Inc., Suncoast Post Tension, Ltd., Builders Mechanical, Inc., and Luxury Baths by Arrow (the Petitioning Creditors)—filed an involuntary petition for relief against the Debtor under Chapter 7 of the United States Bankruptcy Code, commencing case number 09-32467. [Doc. No. 1.]

2. On April 30, 2009, this Court entered an Order for Relief pursuant to Chapter 7 of the Bankruptcy Code. [Doc. No. 10.] On this same day, Rodney Tow was appointed the trustee of the Debtor's estate (the Trustee).

3. Following his appointment, the Trustee began investigating the Debtor's financial affairs, including various prepetition transactions. [Tape Recording, 1/19/11 Hearing at 3:06:13 p.m.]

4. On September 16, 2010, as part of his investigation, the Trustee served John Speer (Speer) with a subpoena duces tecum. [Trustee's Ex. No. 1.] Speer's relationship to the Debtor was a significant one.[2] [Tape Recording, 1/19/11 Hearing at 3:24:43 p.m. & 3:24:56 p.m.]

5. The subpoena duces tecum requested Speer to produce documents and communications pertaining to business transactions, financial matters, and litigation involving Speer and the Debtor. [Trustee's Ex. No. 1.] Notably, the Trustee

---

[1] Although the Debtor is a limited partnership, the Debtor in this opinion is occasionally referred to as "the company," and any of its assets are occasionally referred to as a "company asset."

[2] Speer's position with respect to the Debtor is very similar to those employees of debtors who are identified in what the bankruptcy bar has come to refer to as "KERPs." KERP is an acronym for "Key Employee Retention Plan." Bankruptcy courts in recent years have routinely approved debtors' motions for implementation of KERPs. These motions request that courts approve debtors' programs that provide economic incentives to important decision makers—such as, chief executive officers, presidents, chief financial officers, and others—so that the debtors have a reasonable chance of keeping these decision makers rather than losing them to other organizations. *See generally In re Brooklyn Hospital Ctr.*, 314 B.R. 405 (Bankr. E.D.N.Y. 2006); *In re Allied Holdings, Inc.*, 337 B.R. 716 (Bankr. N.D. Ga. 2005).

requested Speer to produce "Communications" between Speer and his attorneys, such as communications between "John Speer and Michael Manners, their agents, attorneys, representatives, or employees," "Michael Manners or his attorney and John Speer or his attorney," "Speer and any attorney or employee at Porter & Hedges," "Speer or his attorney and Amegy Bank or its attorneys," and "Speer or his attorneys, and George Kopecky or his attorneys." [Trustee's Ex. No. 1.] Thus far, the Trustee has only filed a Notice of Intention to Take a Rule 2004 Examination of Speer. [Doc. No. 296.] No suit has been filed against Speer.

6. Speer produced some of the requested documents and withheld others on the basis of the attorney-client privilege. [Tape Recording, 1/19/11 Hearing at 3:06:40 p.m.]

7. Speer incorporated a privilege log with his response to the Trustee's subpoena. The privilege log contains approximately 1,000 entries, one entry for each document that was not produced to the Trustee. [Trustee's Ex. No. 3.]

8. Each entry in Speer's original privilege log was comprised of seven to nine fields. The fields were labeled as follows: Date, Description, Author, Addressee(s), Other Recipients, Privilege Claimed, Pages, and Att't Pages. [Trustee's Ex. No. 3.]

9. In his privilege log, Speer provided one or two words for each field entry. For example, the document occupying the first row of the privilege log is dated "12/30/08" and is described as an "email," authored by "John Ransom," addressed to "Michael Wilk," with "John Speer" as an additional recipient, and the privileged claimed is the "Atty-Client" privilege. The majority of the communications Speer withheld were e-mails between Speer and his attorneys. Also, Speer cited the

3

attorney-client privilege as the basis for denying disclosure for most of these e-mails. [Trustee's Ex. No. 3.]

10. Soon thereafter, the Trustee objected to Speer's privilege log. [Tape Recording, 1/19/11 Hearing at 3:07:33 p.m.] Speer, through his counsel, submitted an amended privilege log. [Trustee's Ex. No. 4.] Subsequently, he submitted a second amended privilege log. [Speer's Ex. No. 2.] Speer's second amended privilege log is almost identical to the original privilege log and the amended privilege log in that, like its predecessors, the withheld documents are described by merely one or two words, most of the withheld documents or communications are e-mails, and the basis for withholding most of these documents is the attorney-client privilege. [Speer's Ex. No. 2.] Below is the Court's reproduction of the first entry of Speer's second amended privilege log, and this entry is representative of all the entries:

| JHSP | Date | Description | Author | Addressee(s) | Other Recipients | Privilege Claimed | Capacity | Pages |
|------|------|-------------|--------|--------------|------------------|-------------------|----------|-------|
| 1 | 12/30/2008 | Email | John Ransom, Esq. | Michael Wilk, Esq. | John Speer | Attorney Client | Individual | 1 |

11. On December 31, 2010, the Trustee filed a Motion to Compel Production of Documents Claimed as Privileged by John Speer. [Doc. No. 306.] The Trustee argues that the communications listed in Speer's privilege log are either not privileged or the privilege has been waived. [Doc. No. 306, p. 6–8, ¶ 21.] The Trustee relies on the federal common law's interpretation of the attorney-client privilege to support his arguments. [Doc. No. 306, p. 8–12.] Generally, the Trustee contends that the attorney-client privilege does not attach to Speer's e-mails because Speer cannot carry his burden in proving the e-mails are privileged. [Tape

Recording, 1/20/11 Hearing at 10:32:15 a.m.]  Additionally, the Trustee asserts that the attorney-client privilege does not attach to any communications or documents relating to the legal representation of the Debtor or to any communications involving matters in which the Debtor and Speer were jointly represented by counsel.  [Doc. No. 306, p. 8–10, ¶¶ 24–28.]  Moreover, the Trustee contends that any privilege that may have attached to Speer's communications has otherwise been waived by virtue of Speer's disclosure of the e-mails to third parties and the Debtor's Electronic Communications Policy setting forth that employees could have no expectation of privacy in their personal e-mails.  [Doc. No. 306, p. 6, 11–13.]

12. On January 18, 2011, Speer filed a Response in Opposition to the Trustee's Emergency Motion to Compel Production of Documents.  [Doc. No. 334.]  He maintains that the attorney-client privilege, as interpreted under Texas law, shields the communications requested by the Trustee from disclosure.  [Doc. No. 334, p. 5–8, ¶¶ 23–32.]  Speer argues that he has not waived the privilege, as the only third parties privy to his communications (Nancy Boothe and Ryan Gresham) were necessary parties for purposes of the attorney-client privilege.[3]  [Doc. No. 334, p. 7, ¶ 32.]

13. On January 19, 2011, this Court held a hearing on the Trustee's motion to compel (the Hearing).  Speer did not personally appear at the Hearing.

14. At the Hearing, the Trustee adduced testimony from Nancy Boothe (Boothe), Speer's former executive assistant at the Debtor.  [Tape Recording, 1/19/11 Hearing at

---

[3] At the Hearing, Speer's counsel also argued that Speer was unaware of the Debtor's Electronic Communications Policy, and that the policy was not enforced.  [Tape Recording, 1/20/11 Hearing at 10:46:16 a.m.]  However, there is no evidence in the record on these two points.  The assertions made by Speer's counsel are a classic example of arguing outside of the record.  This tactic will not work.

2:29:35 p.m.]  Boothe was employed by the Debtor from March 2000 until October 2008.  [Tape Recording, 1/19/11 Hearing at 2:30:34 p.m.]

15. Intermittently, Boothe functioned as a paralegal.  [Tape Recording, 1/19/11 Hearing at 2:30:54 p.m.]  As a paralegal for the Debtor, Boothe was generally involved in litigation matters.  [Tape Recording, 1/19/11 Hearing at 2:31:00 p.m.]  For example, she gathered documents and delivered them to the Debtor's hired counsel in response to requests for discovery.  [Tape Recording, 1/19/11 Hearing at 2:32:45 p.m.]  Not only did Boothe perform paralegal-related tasks for the Debtor, she also worked on legal projects for Speer in his individual capacity.  [Tape Recording, 1/19/11 Hearing at 2:52:52 p.m.]  Testimony was adduced at the Hearing that several of the Debtor's attorneys also represented Speer in personal matters.  [Tape Recording, 1/19/11 Hearing at 4:04:09 p.m.]  Boothe admitted that she has absolutely no legal education. [Tape Recording, 1/19/11 Hearing at 2:29:49 p.m.]

16. While working for the Debtor, Boothe was assigned a computer.  [Tape Recording, 1/19/11 Hearing at 2:33:00 p.m.]  Boothe used this computer to carry out her paralegal-related tasks, to draft e-mails for general business-related matters, and for her personal matters.  [Tape Recording, 1/19/11 Hearing at 2:33:50 p.m.]

17. At the Hearing, Boothe testified that her computer, as well as all company computers, were subject to the Debtor's Electronic Communications Policy.  [Tape Recording, 1/19/11 Hearing at 2:49:07 p.m.]  The Debtor's Electronic Communications Policy was included in its Employee Handbook.  [Trustee's Ex. No. 6; 1/19/11 Hearing at 2:49:22 p.m.]  The Handbook states as follows:

**POLICY:**

6

All electronic communications are the property of the Company and all information contained on any electronic communication system belongs to the company and nothing on them will be considered private.

**DEFINITION**:

Electronic communications are e-mails, voice-mail, corporate Web sites and company Internet use.

**ALL EMPLOYEES:**

Electronic communication systems are to be used for company business.   Employees may conduct limited, reasonable and appropriate personal communications on the company's electronic communication system with the understanding that personal communications may be accessed, viewed, read or retrieved by a company Manager or employee.

Employees may **NOT** download any information over the Internet or register with any Internet company using the company's e-mail address without permission form [sic] the President.

Employees are **NEVER** permitted to participate in chat rooms on company equipment during business hours.

Employees are **NOT** authorized to send, circulate, [sic] receive discriminatory or defamatory statements, profanity, or any statements or jokes that could be considered sexually harassing.

Employees are **NOT** to install or view any software or diskette, personal or business related that does not have prior approval from the President.

Employees are to be aware that although the Company has installed software with virus detection, external e-mail messages with attachments may contain a virus.  Suspicious external e-mail attachments should not be opened without first contacting the Administrative Coordinator.

Employees are **NOT** to disseminate any confidential information over the company's system.

[Trustee's Ex. No. 6.]

7

18. Boothe testified that Speer also possessed a company computer and e-mail account during his tenure with the Debtor. [Tape Recording, 1/19/11 Hearing at 2:52:03 p.m.] Similar to Boothe, Speer used his computer, including his company e-mail account, for personal matters. [Tape Recording, 1/19/11 Hearing at 2:52:16 p.m.] In fact, all of the communications at issue were transmitted via the Debtor's computer system. [Tape Recording, 1/19/11 Hearing at 4:05:18 p.m.] According to Boothe, Speer's company e-mail account was password protected. [Tape Recording, 1/19/11 Hearing at 2:52:27 p.m.]

19. Speer granted Boothe access to his company-related e-mails and personal e-mails in connection with her job duties and responsibilities while employed by the Debtor. [Tape Recording, 1/19/11 Hearing at 2:52:33 p.m.]

20. At some point, the Debtor's computer server malfunctioned. [Tape Recording, 1/19/11 Hearing at 2:37:09 p.m.] Prior to the malfunction, information on company computers, including personnel e-mail account information, was backed up onto a disk. [Tape Recording, 1/19/11 Hearing at 2:37:05 p.m.] According to Boothe, this malfunction interfered with the computer server's back-up capabilities. [Tape Recording, 1/19/11 Hearing at 2:37:13 p.m.] As a consequence, the e-mail accounts of three company officers and another secretary were downloaded onto her computer's hard drive. [Tape Recording, 1/19/11 Hearing at 2:37:37 p.m.] These individuals were: President of Park Lake George Kopecky (Kopecky),[4] Executive Vice President James Hunter, Chief Financial Officer William Gatham, and

---

[4] Park Lake is an entity affiliated with the Debtor.

8

Executive Administrator Amy Matters.  [Trustee's Ex. No. 6; Tape Recording, 1/19/11 Hearing at 2:37:47 p.m.]

21.  In October 2008, Boothe decided to leave her full-time position at the Debtor for a position as a legal secretary at Phelps Dunbar, LLP (Phelps Dunbar). [Trustee's Ex. No. 6.]  At Phelps Dunbar, Boothe worked under Patricia Hair, an attorney who had previously handled litigation for the Debtor.  [Trustee's Ex. No. 6.]

22. Before Boothe left the Debtor, Speer directed Boothe to take the Debtor's computer to her home.  [Tape Recording, 1/19/11 Hearing at 2:38:11 p.m.]  She testified that her continued use of the computer was necessary because she planned on remaining the Debtor's "liaison" to attorneys who were working on litigation involving the Debtor.  [Tape Recording, 1/19/11 Hearing at 2:36:16 p.m.]

23. Speer neither placed nor enforced restrictions on the use of the Debtor's computer or the data stored on the computer.  [Tape Recording, 1/19/11 Hearing at 2:38:24 p.m.]

24. In November 2008, Speer called Boothe and offered Boothe a part-time task related to litigation between the Debtor and a former company officer, George Kopecky. [Tape Recording, 1/19/11 Hearing at 2:29:07 p.m.]  Kopecky had sued the Debtor, Speer in his personal capacity, and another entity.  [Tape Recording, 1/19/11 Hearing at 3:02:52 p.m.]  Apparently, the same counsel represented Speer and the Debtor in the Kopecky litigation.  [Tape Recording, 1/19/11 Hearing at 4:04:20 p.m.]  Boothe testified that she was aware of disputes between Kopecky and Speer while she was employed by the Debtor, but a lawsuit had not yet been filed during her tenure.  [Tape Recording, 1/19/11 Hearing at 2:53:00 p.m.]

25. Speer instructed Boothe to print out his company e-mails, review them, and sort each individual e-mail into privileged and non-privileged piles for the purpose of discovery preparation. [Tape Recording, 1/19/11 Hearing at 2:39:22 p.m.] Speer hired Boothe for this task in her personal capacity, not as an employee of Phelps Dunbar. [Tape Recording, 1/19/11 Hearing at 2:39:29 p.m.] In addition, Speer directly paid Boothe. [Trustee's Ex. No. 6.]

26. In order to perform this job, Boothe needed Speer's e-mails, as they were not contained in her computer's hard drive. [Tape Recording, 1/19/11 Hearing at 3:02:10 p.m.] Speer directed an individual by the name of Ryan Gresham (Gresham) to acquire Speer's e-mails, to personally deliver the e-mail data to Boothe's home, and to transfer the e-mails onto Boothe's computer. [Trustee's Ex. No. 6; Tape Recording, 1/19/11 Hearing at 2:39:50 p.m.] Gresham is neither an attorney nor a paralegal. [Tape Recording, 1/19/11 Hearing at 3:02:01 p.m.]

27. Boothe began her task by printing out hard copies of Speer's e-mails. [Tape Recording, 1/19/11 Hearing at 2:41:45 p.m.] She proceeded to separate the documents into privileged and non-privileged stacks. [Tape Recording, 1/19/11 Hearing at 2:42:10 p.m.] She carried out this task at her home. [Tape Recording, 1/19/11 Hearing at 2:41:41 p.m.]

28. Boothe testified that the hard copies of Speer's e-mails filled up eight banker's boxes. [Tape Recording, 1/19/11 Hearing at 2:40:59 p.m.]. She estimated that she had reviewed several thousand e-mails. [Trustee's Ex. No. 6.]

29. Once Boothe completed the assigned discovery task for Speer, she took the eight boxes to her office at Phelps Dunbar. She then notified Speer and his attorney, Mike

10

Wilk (Wilk), that the e-mails were ready for their review.  [Tape Recording, 1/19/11 Hearing at 2:43:46 p.m.]

30. Speer and Wilk called Boothe and told her that the Kopecky litigation had settled and that Speer's e-mails were no longer needed.  [Tape Recording, 1/19/11 Hearing at 2:44:39 p.m.]

31. Either Speer or Wilk, or both, instructed Boothe to discard the hard copy e-mails. [Tape Recording, 1/19/11 Hearing at 2:44:42 p.m.]  In turn, she placed them in the Phelps Dunbar recycling bin.  [Tape Recording, 1/19/11 Hearing at 2:44:48 p.m.]

32. Speer has never given Boothe instructions to delete his e-mails from the Debtor's computer hard drive.  [Trustee's Ex. No. 6; Tape Recording, 1/19/11 Hearing at 2:45:15 p.m.]  Additionally, Speer has never requested that Boothe return the computer.  [Trustee's Ex. No. 6; Tape Recording, 1/19/11 Hearing at 2:45:22 p.m.]

33. At some point after the Trustee was appointed in the Debtor's Chapter 7 case, the Trustee met with Boothe's superior at Phelps Dunbar, Patricia Hair, to discuss a matter concerning the Debtor.  [Tape Recording, 1/19/11 Hearing at 2:45:53 p.m.] The Trustee also approached Boothe and asked her whether she was in possession of any of the Debtor's computer data.  [Tape Recording, 1/19/11 Hearing at 3:53:10 p.m.]  When she responded in the affirmative, the Trustee advised Boothe that he would ultimately seek that information.  [Tape Recording, 1/19/11 Hearing at 2:46:15 p.m.]  At the time of this discussion, Boothe did not mention that Speer's e-mails were on the computer.  [Tape Recording, 1/19/11 Hearing at 2:56:45 p.m.]

34. Subsequently, Boothe informed Speer that the Trustee had requested the information from the computer in her possession.  [Tape Recording, 1/19/11 Hearing at 2:46:25

p.m.]  According to Boothe, Speer did not object to the Trustee's gaining access to the information stored on the computer.  [Tape Recording, 1/19/11 Hearing at 2:46:34 p.m.]  This was the first occasion that Boothe alerted Speer that the Trustee was seeking information from the computer's hard drive.  [Tape Recording, 1/19/11 Hearing at 2:46:44 p.m.]

35.  Boothe and the Trustee scheduled a date and time for the Trustee to extract the information stored on the Debtor's computer.  [Tape Recording, 1/19/11 Hearing at 2:47:00 p.m.]

36.  Once this date was determined, Boothe notified Speer of the date.  And, she testified that she clearly cautioned him that she planned to provide the Trustee with the Debtor's information and data on the computer.  [Tape Recording, 1/19/11 Hearing at 2:47:35 p.m.]  Speer did not object.  [Tape Recording, 1/19/11 Hearing at 2:47:27 p.m.]  Nor did he instruct Boothe to segregate, destroy, or delete his e-mails.  [Tape Recording, 1/19/11 Hearing at 2:47:49 p.m.]

37.  Thereafter, the Trustee ordered an individual to visit Boothe's home for the purpose of copying the Debtor's computer data.  [Tape Recording, 1/19/11 Hearing at 3:10:55 p.m.]  Boothe admitted she knew the Trustee's representative was at her home to retrieve all the information from the computer, including information unrelated to the Debtor such as her own personal information.  [Tape Recording, 1/19/11 Hearing at 2:57:30 p.m.]  She also "couldn't help but know" Speer's e-mails were stored on the computer.  [Tape Recording, 1/19/11 Hearing at 3:00:53 p.m.]  And, she allowed the Trustee to copy all of the information.  [Tape Recording, 1/19/11 Hearing at 2:57:52 p.m.]

38. The Trustee took possession of the computer's contents, including Speer's e-mails. [Tape Recording, 1/19/11 Hearing at 3:11:00 p.m.]  He began reviewing the data. [Tape Recording, 1/19/11 Hearing at 3:11:25 p.m.]

39. As evidenced by his response to the Trustee's motion to compel and his privilege logs, Speer now contends that many of his personal e-mails that the Trustee exported from Boothe's computer are protected from disclosure by the attorney-client privilege.  [Doc. No. 334; Trustee's Ex. Nos. 3 & 4.]

40. At the Hearing, the Trustee testified that the first time Speer objected to the disclosure of the e-mails located in Boothe's computer on the basis of privilege was after the September 16, 2010 subpoena was served on him.  [Tape Recording, 1/19/11 Hearing at 3:14:04 p.m.]

41. At or around this time, for the first time Speer also objected to the disclosure of certain e-mails contained in two of the Debtor's hard drives.  [Tape Recording, 1/19/11 Hearing at 3:13:39 p.m.]  One of these hard drives was restored by the Trustee himself pursuant to his preliminary investigation of the Debtor.  [Tape Recording, 1/19/11 Hearing at 3:09:25 p.m.]  A second hard drive was produced by Speer in compliance with a September 22, 2009 court order.  [Doc. No. 119.]  At the Hearing, the Trustee repeatedly referred to all of these sources collectively as "the Royce server."  [Tape Recording, 1/19/11 Hearing at 3:26:49 p.m.]

42. After Speer asserted that his e-mails stored on the Debtor's hard drives and Boothe's computer were privileged, the Trustee had two telephone conversations with Speer's personal counsel on the same day.  [Tape Recording, 1/19/11 Hearing at 4:02:43 p.m.]  During the first conversation, Speer's counsel did not demand that the Trustee

refrain from reviewing these communications.  [Tape Recording, 1/19/11 Hearing at

3:14:49 p.m.]  A short time thereafter, Speer's counsel called the Trustee back.  [Tape

Recording, 1/19/11 Hearing at 4:02:55 p.m.]  This time, he told the Trustee that Speer

generally was not waiving any privileges.  [Tape Recording, 1/19/11 Hearing at

4:02:57 p.m.]

### III. CREDIBILITY OF WITNESSES

At the Hearing on January 19, 2011, this Court heard testimony from Nancy Boothe,

Speer's former executive assistant at the Debtor, and Rodney Tow, the Trustee of the Debtor's

estate.  The Court's assessment of the credibility of each witness is set forth below.

### A.  Nancy Boothe

The Court finds Nancy Boothe to be a credible witness.

### B.  Rodney Tow

The Court also finds Rodney Tow to be a credible witness.

### IV. CONCLUSIONS OF LAW

### A.  Jurisdiction and Venue

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a).

This dispute between the Trustee and Speer is a core proceeding pursuant to 28 U.S.C. §

157(b)(2)(A) because it concerns the administration of the Debtor's Chapter 7 estate.  Among

other things, the Trustee is investigating the prepetition transactions relating to the Debtor to

assess whether to file adversary proceedings under various provisions of the Bankruptcy Code.

Some of these transactions may include Speer—who, as a key employee of the Debtor,

necessarily was involved in numerous transactions concerning the Debtor—and the Trustee is

entitled to investigate these transactions; indeed, the Trustee has a duty to do so.  Additionally,

14

this proceeding is a core proceeding under the general "catch-all" language of 28 U.S.C. § 157(b)(2).  *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) "even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").  Venue is proper pursuant to 28 U.S.C. § 1408(1).

## B.  The Federal Common Law Rules Determine Whether the Attorney-Client Privilege Shields Speer's E-mails from Production.

The Trustee cites to federal law in his Emergency Motion to Compel Production of Documents Claimed as Privileged by John Speer.  [Finding of Fact No. 11.]  In his response in opposition to the motion, Speer argues that the Texas law of privilege controls whether this Court should grant or deny the Trustee's motion.  [Finding of Fact No. 12.]  In fact, all of Speer's arguments revolve around Texas law.  [Doc. No. 334.]  This Court disagrees with Speer's application of Texas law to the issues in this dispute, and concludes that the federal common law of attorney-client privilege determines whether Speer's e-mails are shielded from production.

Rule 501 of the Federal Rules of Evidence, which is applicable pursuant to Bankruptcy Rule 9017, provides that:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.  However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule

of decision, the privilege of a witness, person, government, State or political subdivision thereof shall be determined in accordance with State law.

Courts in this circuit interpret Rule 501 to mean that questions of attorney-client privilege that arise in a federal proceeding are generally controlled by the federal common law of privilege. *Alpert v. Rile*y, 267 F.R.D. 202, 207 (S.D. Tex. 2010). Federal courts must apply federal law with one exception—if state law provides the rule of decision with respect to an element of a claim or defense in a *lawsuit. Id.* (emphasis added). In bankruptcy cases, matters purely originating from Bankruptcy Rule 2004 examinations are "nonadversarial in nature." *In re Bounds*, No. 09-12799-CAG, 2010 WL 3447683, at *2 (Bankr. W.D. Tex. Aug. 31, 2010). A matter in connection with a prospective 2004 examination is "aimed at discovering evidence upon which future causes of action may be based and is therefore governed by bankruptcy law rather than state substantive law." *Id.* (quoting *In re North Plaza, LLC*, 395 B.R. 113, 122 (Bankr. S.D. Cal. 2008)). As such, the federal common law controls privileges asserted in the context of 2004 examinations. *In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 254 (Bankr. S.D.N.Y. 2005). If a bankruptcy trustee has yet to file a state law cause of action against a party, state law has no applicability to a privilege issue whatsoever. *Id.* ("Even if the Trustee ultimately intends to pursue state law claims, federal law nonetheless controls the privilege.").

In the dispute at bar, the Trustee has not filed any state law cause of action against Speer, and Speer's assertion of the attorney-client privilege was in response to a subpoena served in connection with a 2004 examination. [Finding of Fact No. 5.] This Court also notes that throughout the Hearing, Speer's counsel vehemently emphasized that Speer is not an adverse party.[5] It follows that federal law controls whether the attorney-client privilege has attached to

---

[5] Specifically, Speer's counsel repeatedly stressed that no suit had been instituted against Speer in response to the Trustee's argument that Speer and the Debtor were jointly represented in several previous legal matters and, therefore, the

Speer's communications or, in the alternative, whether Speer has waived the attorney-client privilege. The Trustee has every right to file a state law cause of action against Speer. However, until he does so, federal law governs.

## C.  Attorney-Client Privileged Communications are Communications Made in Confidence by a Client to His Attorney for the Purpose of Obtaining Legal Advice.

The attorney-client privilege guards confidential communications made by a client to his attorney from disclosure. *United States v. Neal*, 27 F.3d 1035, 1048 (5th Cir. 1994). As noted, the attorney-client privilege is the first privilege established by the common law to protect attorney-client confidential communications. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). It serves to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* The privilege is premised on the attorney's need to "know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." *Id.* (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)).

The Fifth Circuit has defined attorney-client privileged communications as: 1) confidential communications; 2) made to a lawyer or his subordinate; 3) "for the primary purpose of securing either a legal opinion or legal services, or assistance in some legal proceeding." *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997); *United States v. Pipkins*, 528 F.2d 559, 562 (5th Cir. 1976); *Alpert*, 267 F.R.D. at 208.

Not all communications between a client and his or her attorney are protected by the attorney-client privilege. *Pipkins*, 528 F.2d at 562–63 ("The attorney-client privilege, however, is not a broad rule of law which interposes a blanket ban on the testimony of an attorney."). As evidenced by the Fifth Circuit's definition of attorney-client privileged communications,

---

attorney-client privilege had been waived as to those communications. [Tape Recording, 1/20/11 Hearing at 10:52:22 a.m.]

"[w]hile the attorney-client privilege extends to all situations in which counsel is sought on a legal matter, it protects 'only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege.'"  *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 473 (N.D. Tex. 2004) (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)). The attorney-client privilege will not attach to *every* communication between a client and his attorney, as the privilege "does not embrace everything that arises out of the existence of an attorney-client relationship."  *Pipkins*, 528 F.2d at 563; *United States v. Johnson*, 465 F.2d 793, 795 (5th Cir. 1972) ("[N]ot all documents in the hands of an attorney fall within the privilege."); *AHF Cmty. Dev., LLC v. City of Dallas*, 258 F.R.D. 143, 146 (N.D. Tex. 2009) ("[T]he mere existence of an attorney-client privilege relationship or the mere exchange of information with an attorney does not give rise to a presumptive claim of privilege." (quoting *Varo, Inc. v. Litton Sys., Inc.*, 129 F.R.D. 139, 142 (N.D. Tex. 1989))).

### 1. Confidentiality is a Vital Component of the Definition of Attorney-Client Privileged Communications.

Confidentiality, an element of the definition of attorney-client privileged communications, is vital to a claim of attorney-client privilege, as it is the essence of the privilege.  *Robinson*, 121 F.3d at 976; *Indus. Clearinghouse, Inc. v. Browning Mfg. Div. of Emerson Elect. Co.*, 953 F.2d 1004, 1007 (5th Cir. 1992) ("The privilege protects only confidential communications of the client to the attorney."); *Pipkins*, 528 F.2d at 563.

A confidential communication in this context is generally defined as a communication not intended to be disclosed to third parties other than parties reasonably necessary for the transmission of the message or those to whom disclosure furthers the rendition of legal services. 3 WEINSTEIN'S FEDERAL EVIDENCE, § 503.15[1] (2010).  The circumstances surrounding the communication provide evidence of whether the party asserting the privilege intended for his or

18

her communications to be and remain confidential.  *See Robinson*, 121 F.3d at 976.  Specifically, the evidence must show that a party made the communication in confidence and maintained that communication's confidentiality.  *Garner v. Wolfinbarger*, 430 F.2d 1093, 1100 (5th Cir. 1970) (Two "fundamental" conditions of the attorney-client privilege are: "1) The communications must originate in a confidence that they will not be disclosed" and 2) "This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties."  (quoting 8 J. WIGMORE, EVIDENCE § 2285 at 527 (2010))); *Pipkins*, 528 F.2d at 563 ("Thus courts have refused to apply the privilege to information that the client intends his attorney to impart to others . . .  or to communications made in the presence of third parties. ").

     In order to satisfy the Fifth Circuit's definition of a confidential communication, the party invoking the attorney-client privilege must have had a reasonable expectation of confidentiality or privacy.  *Robinson,* 121 F.3d at 976 ("The assertor of the privilege must have a reasonable expectation of confidentiality, either that the information disclosed is intrinsically confidential, or by showing that he had a subjective intent of confidentiality." (citing *United States v. Melvin*, 650 F.2d 641, 646-47 (5th Cir. Unit B 1981))); *Pipkins*, 528 F.2d at 563 (Defendant failed to establish confidentiality, as the record did not indicate he subjectively intended for his handwriting samples to be or remain confidential.).

     The confidentiality of an attorney-client communication determines the presence or absence of waiver.  The Fifth Circuit and district courts in this circuit include the presence or absence of waiver in their definition of attorney-client privileged communications.  *In re Grand Jury Proceedings*, 517 F.2d 666, 670 (5th Cir. 1975) ("[T]he privilege has been (a) claimed and (b) not waived by the client."); *Synair Corp. v. Am. Indus. Tire, Inc.*, 645 F. Supp. 1080, 1083 (S.D. Tex. 1986).  "The confidentiality element and waiver are closely related inasmuch as any

voluntary disclosure inconsistent with the confidential nature of the attorney client relationship waives the privilege." *Hartford Fire Ins. Co. v. Garvey*, 109 F.R.D. 323, 327 (N.D. Cal. 1985).

    2. <u>To Retain Their Privileged Character, Attorney-Client Privileged Communications Cannot be Waived.</u>

    In order to retain their privileged character, attorney-client privileged communications cannot be waived. *Grand Jury Proceedings*, 517 F.2d at 670. Whether the claimant has waived the privilege is a fact-specific inquiry. *Alpert*, 267 F.R.D. at 209 ("Waiver is a fact-specific question that should be assessed on a case-by-case basis." (citing *Alldread v. City of Grenada*, 988 F.2d 1425, 1434 (5th Cir. 1993))).

    Under federal common law, a party can waive the attorney-client privilege in two ways— by voluntarily disclosing privileged communications or by inadvertently disclosing those communications to third parties. *Alldread*, 988 F.2d at 1434; *AHF Cmty. Dev.*, 258 F.R.D. at 148-49. As already noted, disclosure inconsistent with an intent that communications remain confidential waives the privilege.

    Voluntary disclosure is simply defined as voluntarily disclosing or offering or producing privileged communications to a third party without objection. *Ratliffe v. Davis Polk & Wardwell*, 354 F.3d 165, 170 (2d Cir. 2003) (attorney-client privilege waived when client authorized law firm to send attorney-client communications to the SEC); *United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 684-87 (1st Cir. 1997) (attorney-client privilege waived when a government contractor produced documents to the Defense Department's audit agency). For example, a party who fails to assert the attorney-client privilege when confidential information is sought in a legal proceeding voluntarily waives the privilege. *Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir. 1999) ("Further inquiry into the substance of the client's and attorney's discussions does implicate the privilege and an assertion is required to preserve the privilege.");

*AHF Cmty. Dev.*, 258 F.R.D. at 149 (concluding that disclosure was voluntary where plaintiff's deposition questions and exhibits provided defendants with notice that privileged documents were produced to plaintiffs, and defendants did not object to their disclosure).   Courts ask whether a party intended to provide third parties access to his or her confidential attorney-client communications in determining whether disclosure was voluntary.   *See Alpert*, 267 F.R.D. at 210 (concluding that there was no evidence that defendant "intended" to make information on a computer available to third parties).

Inadvertent disclosure generally refers to those instances where a party unintentionally or involuntarily discloses privileged communications to an opposing party during discovery.   *Id.* at 209–10.   Under such circumstances, courts rely on Rule 502 of the Federal Rules of Evidence to determine whether inadvertent disclosure operates as a waiver.   *Id.*   Rule 502 provides that inadvertent disclosure does not waive the attorney-client privilege if the holder of the privilege took reasonable steps to prevent disclosure and took reasonable steps to correct the error.   The Fifth Circuit conjunctively evaluates five factors in determining whether inadvertent disclosure warrants a finding of waiver.   *Id.*   These factors are: (1) The reasonableness of precautions taken to prevent disclosure; (2) The amount of time taken to remedy the error; (3) The scope of discovery; (4) The extent of the disclosure; and (5) The overriding issue of fairness.   *Alldread*, 988 F.2d at 1433.   In the event the privilege holder did not inadvertently disclose his communications during discovery, courts resort to analyzing these five factors.   *Alpert*, 267 F.R.D. at 209–10.   As this Court will discuss subsequently, the claimant of the privilege bears the burden of proving he did not waive the privilege, in addition to proving that the privilege attached to his communications in the first place.

**D.  Speer, as the Party Invoking the Privilege, Bears the Burden of Proving Whether the Privilege Applies.**

Fifth Circuit cases on attorney-client privilege incontestably stand for the proposition that the party invoking the privilege bears the burden of proving that his or her communications are privileged and, therefore, protected from disclosure.  *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001) ("A party asserting a privilege exemption from discovery bears the burden of demonstrating its applicability."); *Hodges, Grant & Kaufman v. U.S. Gov't, Dept. of the Treasury, IRS*, 768 F.2d 719, 721 (5th Cir. 1985) ("The burden of demonstrating the applicability of the privilege rests on the party who invokes it.").  In this dispute, Speer asserts the attorney-client privilege attached to the e-mails that the Trustee recovered from the Debtor's hard drives and Boothe's computer.  Therefore, it is Speer's burden to prove the applicability of the privilege.

Specifically, Speer bears the burden of proving *each and every element* of the definition of attorney-client privileged communications, including confidentiality and absence of waiver. *Robinson*, 121 F.3d at 974; *Hodges, Grant & Kaufman*, 768 F.2d at 721; *United States v. El Paso Co.*, 682 F.2d 530, 538 (5th Cir. 1982); *Pipkins*, 528 F.2d at 563 (defendant failed to establish confidentiality); *Zelaya v. Unicco Serv. Co.*, 682 F. Supp. 2d 28, 38 (D.C. Cir. 2010) (holding the claimant must provide competent evidence that supports each of the essential elements necessary to sustain a claim of privilege); *Asia Global*, 322 B.R. at 255 ("The person asserting the privilege has the burden of proving the communication is privileged, and that the privilege was not waived.").  Speer must also prove that the attorney-client privilege applies to each and every communication he is claiming as privileged.  *El Paso Co.*, 682 F.2d at 539 ("The privilege must be specifically asserted with respect to particular documents.").  "[T]he attorney-client privilege may not be tossed as a blanket over an undifferentiated group of documents."  *Id.*  Blanket and

22

conclusory assertions of privilege do not satisfy a claimant's burden whatsoever. *Id.* at 542 (claimant did not satisfy its burden where it "failed to particularize its assertion of the privilege and prove its case with respect to any specific document"); *SEC v. Microtune*, 258 F.R.D. 310, 315 (N.D. Tex. 2009) ("[T]he privilege does not protect documents and other communications simply because they result from an attorney-client relationship."). Blanket assertions of privilege are also unacceptable in the context of attorney-client privilege because courts have a duty to narrowly construe assertions of privilege. *Pipkins*, 528 F.2d at 563; *Garner*, 430 F.2d at 1101. Courts cannot accept conclusory assertions of privilege at face value.

**E. This Court Must Narrowly Construe Speer's Assertion of the Attorney-Client Privilege.**

Federal courts, including the Fifth Circuit, have consistently held that the attorney-client privilege must be "strictly confined within the narrowest possible limits consistent with the logic of its principle." *Pipkins*, 528 F.2d at 563; *Garner*, 430 F.2d at 1101 (The privilege "ought to be strictly confined within the narrowest possible limits, consistent with the logic of its principle."); *Hartford Fire Ins.*, 109 F.R.D. at 327; *Asia Global*, 322 B.R. at 255 ("The privilege must be narrowly construed.").

Courts narrowly construe a claim of attorney-client privilege because the privilege hinders discovery, standing in "derogation of the public's right to every man's evidence, and as an obstacle to the investigation of truth." *Pipkins*, 528 F.2d at 563. The privilege is not inviolable. It must be "placed in perspective" and applied only where all of its elements and conditions are satisfied. *See Garner*, 430 F.2d at 1100 ("The privilege must be placed in perspective. The beginning point is the fundamental principle that the public has the right to every man's evidence . . . . ").

This guiding principle, in conjunction with the Court's other findings and conclusions,

leads the Court to conclude Speer has failed to carry his burden of proving the attorney-client privilege attaches to his e-mails.

**F.  Speer Has Failed to Carry His Burden of Proving That the Attorney-Client Privilege Attaches to His E-mails.**

>    1. Speer's Evidence Fails to Prove That His E-mails Were Confidential Communications Transmitted for the Primary Purpose of Securing Legal Advice.

At the Hearing, the Trustee adduced testimony from two witnesses, Nancy Boothe and himself.  [Finding of Fact Nos. 14 & 40.]   The Trustee also introduced—and the Court admitted—several exhibits, including Boothe's affidavit with an attachment of the Debtor's Electronic Communications Policy and Speer's original and amended privilege logs.  [Finding of Fact Nos. 7–10 & 17; Trustee's Ex. No. 6.]  Speer's counsel did not call any witnesses of his own, but merely introduced—and the Court admitted—Speer's second amended privilege log as an exhibit.   Speer's counsel also unsuccessfully attempted to admit an affidavit from Speer himself.  [Tape Recording, 1/19/11 Hearing at 4:06:38 p.m.]  Speer did not personally appear at the Hearing.  [Finding of Fact No. 13.]  The Court finds that Speer did not satisfy his evidentiary burden in proving each and every element of the attorney-client privilege.  Speer's evidence that his e-mails are privileged—notably, his second amended privilege log—amounts to superficial invocations of the privilege.[6]

A claimant of the privilege bears the burden of proving: (a) each and every essential element of the definition of attorney-client privileged communications; and (b) that the privilege applies to each document he or she seeks to protect.  *El Paso Co.*, 682 F.2d at 539–42.  "A failure of proof as to any element causes the claim of privilege to fail."  *Varo*, 129 F.R.D. at 142. The assertor of the privilege must provide a court with sufficient and competent evidence to

---

[6] Speer's counsel conducted cross-examinations of both Boothe and the Trustee, but neither provided testimony that helps Speer satisfy his burden in proving all the elements of the attorney-client privilege.

discharge this burden.  *Zelaya*, 682 F. Supp. 2d at 38 (Defendants did not provide "sufficient information to sustain their burden of proof that the attorney-client privilege properly attaches."). "Competent evidence" includes, but is not limited to, affidavits, live sworn testimony, privilege logs, and the documents themselves.[7]  *See id.* at 38–40; *Varo*, 129 F.R.D. at 142.  With respect to these forms of evidence, courts have demanded that they precisely support and prove claims of attorney-client privilege.  *Zelaya*, 682 F. Supp. 2d at 38–39; *Varo*, 129 F.R.D. at 142.  The description of the documents over which the privilege is claimed must provide enough information for the court to determine whether the privilege was properly invoked.  *Zelaya*, 682 F. Supp. 2d at 39; *Microtune*, 258 F.R.D. at 315.  Blank assertions or general allegations of the privilege are unacceptable.  A party's evidence must specifically indicate his communications fall within the definition of the privilege.  *Zelaya*, 682 F. Supp. 2d at 38; *AHF Cmty. Dev.*, 258 F.R.D. at 148 ("Here . . . defendants have not established that the disputed documents identified above are related to specific legal advice or services . . . ."); *Varo*, 129 F.R.D. at 142.  Merely

---

[7]A trial judge has broad discretion in the admission or exclusion of evidence.  *Escalante v. Clinton*, 386 Fed. Appx. 493, 496 (5th Cir. 2010) ("We review the district court's evidentiary rulings for abuse of discretion."); *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1431 (5th Cir. 1989); *Hardy v. Chemetron Corp.*, 870 F.2d 1007, 1009 (5th Cir. 1989) ("[W]e accord considerable deference to the trial judge's evidentiary rulings.").  Moreover, a trial court has even more leeway to admit or exclude evidence when determining the existence of a privilege.  *United States v. Campbell*, 73 F.3d 44, 48 (5th Cir. 1996).  Under Rule 104(a) of the Federal Rules of Evidence, a court is not bound by the rules of evidence when deciding preliminary questions concerning the existence of a privilege.  *Id.*  In *United States v. Campbell*, the general partner of a Chapter 7 debtor was accused of bankruptcy fraud.  *Id.* at 46.  He asserted that a letter from the trustee of the debtor's estate to the debtor's attorney was protected from disclosure by the attorney-client privilege.  *Id.*  In the letter, the trustee waived the attorney-client privilege.  *Id.*  The trial court admitted the letter over the partner's objection.  *Id.*  On appeal, the partner argued that the trial court erred in admitting the exhibit because it was hearsay.  *Id.* at 48.  The court cited to Federal Rule of Evidence 104(a) for the conclusion that courts are not bound by the rules of evidence when determining the applicability of a privilege.  *Id.*  Alternatively, even if the trial court was bound by the rules of evidence, the court did not abuse its discretion in admitting the letter.  *Id.*

It follows that this Court had ample discretion to either admit or exclude Speer's affidavit.  It chose the latter option.  It did so for three reasons.  First, the Trustee objected on the ground that he could not cross-examine Speer about the statements made in his affidavit.  Second, Speer resides in Houston, so it would not be a financial burden on him to travel to the courthouse.  Third, while the attorney-client privilege is certainly an important aspect of the legal system, so is the fiduciary duty that the Trustee has to all creditors of the Debtor's bankruptcy estate.  The Trustee has an absolute fiduciary duty to investigate the affairs of the Debtor in order to locate and liquidate assets of the estate so as to pay claims—in part, if not in whole.  If the Trustee is going to be prevented from reviewing documents based upon Speer's assertion of the attorney-client privilege, then this Court believes that the Trustee ought to at least be able to cross-examine Speer in open court under oath.

because a client has a communication with his or her attorney does not mean that the attorney-client privilege applies; all other elements must be satisfied. *See Pipkins*, 528 F.2d at 562–63; *Johnson*, 465 F.2d at 795; *Microtune*, 258 F.R.D. at 316.

While the documents may in and of themselves provide a court with sufficient evidence to support a finding of attorney-client privilege, the Fifth Circuit has held that the claimant's burden extends "to proof of preliminary facts showing that the matter is eligible for protection." *Santa Fe*, 272 F.3d at 710 n.7 (citing *United States v. Rodriguez*, 948 F.2d 914, 916 (5th Cir. 1991)); *Microtune*, 258 F.R.D. at 315 (Resort to in camera review is appropriate only *after* the burdened party has submitted detailed evidence to the extent possible.").[8]

As previously noted, one proof of evidence a party may offer is his or her privilege log. Rule 26(b)(5) of the Federal Rules of Civil Procedure[9] provides that a party withholding information otherwise discoverable on the basis of privilege must:

> (i) expressly make the claim; and

> (ii) Describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so *in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.*

(emphasis added).  Indeed, brief, short, or general descriptions of the subject matter of each communication are insufficient, as they in no way provide competent evidence of each and every element of the attorney-client privilege.  *Zelaya*, 682 F. Supp. 2d at 38.  A privilege log should "not only identify the date, the author, and all recipients of each document listed therein, but

---

[8] Even if this Court had admitted Speer's affidavit, it was not sufficiently detailed.  *See infra* note 11.  Moreover, the Court notes that Speer did not request an in camera review of his e-mails.  The privilege log is also woefully deficient.  In sum, Speer has chosen the strategy of offering general assertions, rather than specific indications, of privilege.  Accordingly, under these circumstances, the documents that Speer claims to be privileged must be turned over to the Trustee.  *Varo*, 129 F.R.D. at 142 ("Varo did not submit the requested documents to the magistrate for *in camera* review and has not done so in this court . . . .  Instead, Varo relies solely on its privileged documents list . . . .  The court's review of this list indicates that it is essentially a blanket claim of privilege . . . .  "); *Zelaya*, 682 F. Supp. 2d at 38.

[9] Bankruptcy Rule 9014(c) provides that Bankruptcy Rule 7026 applies in contested matters (such as the dispute at bar).  Bankruptcy Rule 7026 incorporates Rule 26 of the Federal Rules of Civil Procedure.

should also describe the document's subject matter, the purpose of its production, and a specific explanation of why the document is privileged or immune from discovery." *Cashman Equip. Corp. v. Rozel Operating Co.*, No. 08-363-C-M2, 2009 WL 2487984, at *2 (M.D. La. Aug. 11, 2009) (citing *Peacock v. Merrill*, No. 08-01-B-M2, 2008 WL 687195, at *3 (M.D. La. Mar. 10, 2008)).

Other forms of evidence a claimant may offer to relieve his burden are detailed affidavits and sworn oral testimony.  Similar to any other form of evidence in this context, affidavits introduced by a party must also clearly show that the documents or communications fall under the definition of attorney-client privilege. *Zelaya*, 682 F. Supp. 2d at 38.  The Court recognizes that sworn oral testimony is not absolutely required of claimants. *Johnson*, 465 F.2d at 795–96. Nevertheless, Fifth Circuit precedent suggests that when a claimant fails to offer sufficient evidence—for example, through third party witnesses, affidavits, or his privilege log—and the court has not conducted an in camera review of the actual documents, the claimant should err on the side of caution and orally testify. *See id.*  Moreover, as noted previously in this Opinion,[10] this Court, as a trial court, has discretion as to whether or not to allow Speer's testimony to be admitted into the record by an affidavit. *Escalante*, 386 Fed. Appx. at 496; *Campbell*, 73 F.3d at 47; *Peteet*, 868 F.2d at 1431; *Chemetron Corp.*, 870 F.2d at 1009.  This Court, in exercising its discretion, sustained the Trustee's objection at the Hearing when Speer's counsel moved to admit Speer's affidavit into the record.  The Court made this ruling on the grounds that the affidavit was rank hearsay.  [Tape Recording, 1/19/11 Hearing at 4:06:38 p.m.]  Because Speer was not present in the courtroom at the Hearing, the Trustee had no way to cross-examine Speer about the testimony set forth in the affidavit.  Given that the Trustee has a fiduciary duty to creditors of

---

[10] *See supra* note 7.

this Chapter 7 estate to recover avoidable transfers effectuated prior to the filing of the Debtor's petition, this Court believes that the Trustee should be allowed to cross-examine Speer under oath about the documents that Speer asserts are privileged.

In this instance, Speer failed to carry his burden of establishing that the attorney-client privilege attaches to his e-mails—and that his e-mails are protected from disclosure—in two major ways. First, Speer's privilege log is grossly deficient in that it did not adequately describe how each document meets the definition of an attorney-client privileged communication. The log is riddled with bald assertions of the privilege. Second, the testimony that Speer's counsel adduced from the two testifying witnesses also did not conform to the Fifth Circuit's requirement of competent evidence on the issue of attorney-client privilege. Neither witness's testimony concerned the *specific* e-mails Speer now claims are privileged, nor did their testimony describe with particularity how *each document* fell within the ambit of the attorney-client privilege.[11]

Speer's privilege log is grossly deficient in that Speer completely fails to describe each and every e-mail's subject matter and why each e-mail should be granted protection. Speer offers the Court general assertions of the privilege rather than specifically indicating and describing the purpose of each communication. Again, the first entry of Speer's second amended privilege log, which is representative of all of the entries, reads as follows:

---

[11] It is worth noting that Speer's affidavit, even if this Court had admitted it into the record, would not have satisfied the Fifth Circuit's requirement for establishing the attorney-client privilege. First, in the affidavit, Speer testifies that "I am familiar with each of the communications listed in Exhibit A attached to this Affidavit." However, there is no "Exhibit A" actually attached to the affidavit. Hence, the communications to which Speer refers are wholly unidentifiable. Under these circumstances, Speer cannot possibly meet his burden. Second, assuming that the "Exhibit A" to which Speer refers is the Second Amended Privilege Log (which this Court did admit into the record), the communications referred to in the Affidavit are presumably those communications referenced in column 3 of the privilege log. Unfortunately for Speer, the only description of the communications in column 3 is the word "Email." The generic use of the word "Email" is insufficient to satisfy the standard established by the Fifth Circuit for properly preserving the privilege. Third, assuming Speer's affidavit was an attempt at describing the contents of his second amended privilege log, the affidavit's description of Speer's communications is utterly deficient. He does not describe the subject matter of even one of these e-mails. Rather, he generically provides a definition of the attorney-client privilege, and tosses it as a blanket over an undifferentiated group of documents. *El Paso Co.*, 682 F.2d at 539.

| JHSP | Date | Description | Author | Addressee(s) | Other Recipients | Privilege Claimed | Capacity | Pages |
|------|------|-------------|--------|--------------|------------------|-------------------|----------|-------|
| 1 | 12/30/2008 | Email | John Ransom, Esq. | Michael Wilk, Esq. | John Speer | Attorney Client | Individual | 1 |

[Finding of Fact No. 10; Speer's Ex. No. 2.]  This barren, elementary list Speer calls his privilege log hardly comports with what federal courts—including the Fifth Circuit—demand of parties invoking the attorney-client privilege.  *Santa Fe*, 272 F.3d at 710 n.7 ("Fifth Circuit cases clearly hold that the privilege claimant's burden extends to proof of preliminary facts showing that the matter is eligible for protection."); *Microtune*, 258 F.R.D. at 315 ("Although a privilege log and *in camera* review of documents may assist the court in conducting its analysis, a party asserting the privilege still must provide a 'detailed description of the materials in dispute and state specific and precise reasons for their claim of protection from disclosure.'" (quoting *Navigant Consulting*, 220 F.R.D. at 473–74)).  Speer forgets that it is his—not the Trustee's—burden to prove that these e-mails are privileged.  *Santa Fe*, 272 F.3d at 710; *Robinson*, 121 F.3d at 974; *Hodges, Grant & Kaufman*, 768 F.2d at 721.  It is his responsibility to satisfy the Fifth Circuit's specific evidentiary requirements.  Providing this Court with a one or two word description of each document does not satisfy his burden.  [Finding of Fact No. 10.]  Jotting down "e-mail" next to "attorney-client privilege"—which is basically what Speer did for every single entry—is devoid of any real evidentiary substance.  Blank assertions of the privilege are unacceptable. *Varo,* 129 F.R.D. at 142 ("Varo has not submitted an affidavit setting forth the specific facts that establish the existence of the privilege . . . .  Instead, Varo relies solely on its privileged documents list to support its claim of protection.  The court's review of this list indicates that it is essentially a blanket claim of privilege . . . . "); *Microtune*, 258 F.R.D. at 315 ("The privilege

does not protect documents and other communications simply because they result from an attorney-client relationship." (citing *Navigant Consulting*, 220 F.R.D. at 477)).

Speer would need to provide a much more detailed description to have any chance of this Court concluding that his documents are privileged.  *Microtune*, 258 F.R.D. at 316 ("A proper claim of privilege requires a specific designation and description of the documents within its scope as well as precise and certain reasons for preserving their confidentiality." (quoting *Greene, Tweed of Delaware, Inc. v. DuPont Elastomers, L.L.C.*, 202 F.R.D. 418, 423 (E.D. Pa. 2001))).   For example, Speer could have easily stated the following, or a version of the following, for each entry: "This was an e-mail transmitted to my attorney [name of attorney] on [set forth specific date]. This communication involved certain questions and comments that I wanted my attorney to focus on in preparation for an upcoming hearing in the Kopecky litigation.  I was asking my attorney for advice about this litigation in my personal capacity.  No third parties were present and I have not shared this e-mail with any third party."  No entry in Speer's privilege log came close to providing the Court with the slightest indication that each e-mail truly constituted a confidential communication from Speer to his personal attorney transmitted for the purpose of securing legal advice.

This Court is required to narrowly construe Speer's assertions of the attorney-client privilege.  *Pipkins*, 528 F.2d at 563; *Garner*, 430 F.2d at 1101 (The privilege "ought to be strictly confined within the narrowest possible limits, consistent with the logic of its principle."); *Hartford Fire Ins.*, 109 F.R.D. at 327; *Asia Global*, 322 B.R. at 255 ("The privilege must be narrowly construed.").   Strictly construed, Speer's privilege log miserably fails at helping Speer satisfy his evidentiary burden of proving that the attorney-client privilege attaches to his e-mails. Furthermore, the testimony Speer's counsel adduced from Boothe at the Hearing neither gave

30

life to Speer's privilege log nor provided sufficient evidence on its own to satisfy Speer's burden.[12]

Speer's counsel failed to adduce testimony from Boothe concerning the subject matter of each individual communication or e-mail, or even the subject matter of groups or sets of e-mails.[13]   Boothe's testimony merely provided the Court with a general background of the Kopecky litigation and the fact Speer was sued individually in the Kopecky litigation.  [Finding of Fact No. 24.]  Boothe gave no testimony about particular e-mails nor did she testify about the legal advice or services Speer was seeking in each e-mail.  *AHF Cmty. Dev.*, 258 F.R.D. at 148 (noting that defendants failed to establish that the communications at issue were related to "specific legal advice or services" that defendants sought from counsel).

For the foregoing reasons, this Court concludes that Speer's e-mails are not privileged because he failed to carry his burden of providing this Court with sufficient evidence establishing that each e-mail is entitled to protection.  *See Santa Fe*, 272 F.3d at 709 n.5 (noting that district courts are not obliged to examine each document before ruling on an attorney-client privilege issue; claimants must first establish that each document withheld is entitled to protection).  Speer had the opportunity to testify as to the nature and purpose of his communications, but failed to avail himself of this opportunity; indeed, at the Hearing, he was conspicuous by his absence [Finding of Fact No. 13.]  This Court will not accept his assertions of privilege at face value.

2. The Trustee, on Behalf of the Debtor's Estate, Holds the Privilege as to Any and all E-mails Speer Transmitted and Received When Speer was Acting as a Representative of the Debtor Prior to the Petition Date.

Although this Court has not inspected in camera the e-mails at issue, the Trustee argued

---

[12] It is noteworthy that Speer provided the Trustee with not one, not two, but three privilege logs.  None of them came within hailing distance of providing the detail necessary to satisfy Speer's burden.

[13] Boothe's specific role in producing or viewing these communications will be discussed in the next section on waiver and confidentiality, where the Court assumes arguendo that the attorney-client privilege initially attached to Speer's e-mails.

at the Hearing that Speer is asserting the privilege as to e-mails electronically signed by Speer as a representative of the Debtor, and transmitted to and from counsel.  [Tape Recording, 1/19/11 Hearing at 3:17:19 p.m.]  The Court concludes that any and all e-mails Speer transmitted and received in his capacity as a representative or agent of the Debtor are not within the scope of Speer's privilege.  The Trustee controls the Debtor's attorney-client privilege.  *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1986).  Therefore, any documents within the scope of the Trustee's privilege can be disclosed at his discretion.

It is well settled that a debtor-partnership's trustee holds the partnership's attorney-client privilege and has the power to waive the privilege with respect to prebankruptcy communications.  *Campbell,* 73 F.3d at 47 (bankruptcy trustee of a debtor-partnership has the authority to waive the attorney-client privilege on behalf of the partnership); *see also Commodity Futures Trading*, 471 U.S. at 352.  An entity's attorney-client privileged communications obviously encompass communications between the entity's counsel and its key personnel transmitted for the purpose of seeking legal advice.  *Commodity Futures Trading*, 471 U.S. at 348*; Upjohn Co.*, 449 U.S. at 383.  Speer was unquestionably a key employee of the Debtor. [Finding of Fact No. 4.]  Therefore, any e-mails between Speer, in his prepetition capacity as the Debtor's representative or agent, and the Debtor's prepetition counsel are not within the scope of Speer's personal privilege.

In sum, for all of the reasons set forth above, Speer has failed to satisfy  his burden of proving that the attorney-client privilege attaches to his e-mails.

**G.  Assuming the Attorney-Client Privilege Attaches to Speer's E-mails, Speer Has Waived the Privilege.**

1. As the Debtor's Electronic Communications Policy Explicitly Provided That the Debtor had Access to Employees' Personal Communications and That Employees Could Not Transmit Confidential Communications on the Debtor's Server, Speer Could Not

<u>Have Reasonably Expected That His Personal E-mail Communications Would Remain Confidential.</u>

Arguendo, the Court will now assume the attorney-client privilege attached to Speer's e-mails and evaluate whether Speer waived any privilege he otherwise had in these documents by transmitting them over the Debtor's server or computer system.  The Debtor had a clear and explicit electronic communications policy banning the dissemination of confidential communication over its computer system and warning that "personal communications may be accessed, viewed, read, or retrieved by a company Manager or employee."  [Finding of Fact No. 17; Trustee's Ex. No. 6; Tape Recording, 1/19/11 Hearing at 2:49:22 p.m.]  The issue is whether Speer had a reasonable expectation of privacy in his e-mails considering the Debtor's Electronic Communications Policy guidelines.  Specifically, could Speer reasonably expect that his e-mail communications would remain confidential?  If Speer did not have a reasonable expectation his e-mails would remain confidential, the attorney-client privilege was waived.

There is no question that Speer used the Debtor's computer server to communicate with attorneys.  [Finding of Fact Nos. 18, 25 & 29.]  Moreover, there is no question that the Debtor's Electronic Communications Policy provided that all communications transmitted via company property should not be considered private, that the company could access and monitor an employee's personal communications at any time, and that employees were prohibited from disseminating confidential information over the company's computer system.  [Finding of Fact No. 17.]  Based upon these circumstances, the Trustee argues that Speer waived any privilege he may have had by virtue of his use of the Debtor's computer server.  Speer provided no controverting evidence to these facts.[14]  Accordingly, the Court finds that Speer waived the

---

[14] At the Hearing, Speer's counsel asserted that Speer was unaware of the Debtor's Electronic Communications Policy and that it was not enforced.  *See supra* note 3.  The Court finds that statements made by Speer's counsel do not constitute evidence.  If Speer's counsel wanted to establish that Speer was unaware of the Debtor's Electronic Communications

attorney-client privilege as to any e-mails he sent and received via the Debtor's computer system, as any communications between Speer and his personal counsel were not confidential.

Case law addressing this very issue has been developing in recent years. Adam C. Losey, *Clicking Away Confidentiality: Workplace Waiver of Attorney-Client Privilege*, 60 FLA. L. REV. 1179, 1184 (2008) ("hodgepodge of emerging case law on the subject"). Most courts addressing the issue of whether an employee destroys any privilege he may have in personal communications transmitted or located on company property base their analysis on the confidentiality of an employee's communications and the employee's reasonable expectation of privacy. *United States v. Etkin*, No. 07-CR-913, 2008 WL 482281, at *3–4 (S.D.N.Y. Feb. 20, 2008); *Long v. Marubeni Am. Corp.*, No. 05Civ.639, 2006 WL 2998671, at *3 (S.D.N.Y. Oct. 19, 2006); *Curto v. Medical World Commc'ns, Inc.*, No. 03CV6327, 2006 WL 1318387, at *5–7 (E.D.N.Y. May 15, 2006); *Kaufman v. Sungard Inves. Sys.*, No. 05-CV-1236, 2006 WL 1307882, at *4 (D.N.J. May 10, 2006); *Asia Global*, 322 B.R. at 255–56; *Nat'l Econ. Research Assocs., Inc. v. Evans*, No. 04-2618-BLS2, 2006 WL 2440008, at *3–4 (Mass. Super. Ct. Aug. 3, 2006); *Stengart v. Loving Care Agency, Inc.*, 201 N.J. 300, 322 (2010). The Fifth Circuit focuses on an individual's reasonable expectation of confidentiality or privacy in determining if the attorney-client privilege generally attaches to communications. *Robinson*, 121 F.3d at 975–76 (citing *Melvin*, 650 F.2d at 646-47); *Pipkins*, 528 F.2d at 563 (Defendant failed to establish confidentiality, as the record did not indicate he subjectively intended for his handwriting samples to be or remain confidential.). Again, waiver and confidentiality are closely related in that the absence of continued confidentiality waives the attorney-client privilege. *Hartford Fire Ins.*, 109 F.R.D. at 327 (N.D. Cal. 1985) ("The confidentiality element and waiver are closely

---

Policy, and that this policy was not enforced, he needed to introduce competent evidence. He did not do so. Accordingly, there is nothing in the record to support the allegation that Speer was unaware of the policy and that this policy was not enforced.

related inasmuch as any voluntary disclosure inconsistent with the confidential nature of the attorney client relationship waives the privilege.").  In this context, the absence of a reasonable expectation that one's emails will remain confidential waives the privilege.

*Asia Global*, decided by the United States Bankruptcy Court for the Southern District of New York, is almost directly on point with the dispute at bar.  322 B.R. 247.  *Asia Global* involved two affiliated companies in bankruptcy.  The trustee for the debtor's estate subpoenaed a group of company officers (the Insiders), requesting that they disclose documents relating to the debtor's "acts, conduct, property, liabilities and/or financial condition" and/or "any other matters which may affect the administration of the Debtors' estates," including "all correspondence, memoranda, and all other documents, electronic records, and other media."  *Id.* at 253.  The Insiders withheld personal e-mails between themselves and their personal attorneys, transmitted via the debtor's e-mail server, on the basis of attorney-client privilege.  *Id.*  The trustee moved to compel production of the withheld documents.  *Id.*  The trustee "contend[ed] that the use of the corporate e-mail system waived any privileges that otherwise existed."  *Id.* And, "Asia Global maintained a corporate policy that warned e-mail users that the e-mails were the debtor's property, the e-mail system was not secure, that third-parties had access to the e-mail system, and that no one was authorized to use the e-mail system to transmit confidential or secret information."  *Id.*

In *Asia Global*, the court declared "[t]he main gist of the current dispute concerns the confidentiality of e-mail communications."  *Id.* at 256.  The use of a company's computer to transmit and receive e-mails does not alone destroy the confidentiality necessary to preserve a claim of attorney-client privilege.  *Id.* at 251, 256.  The court relied on Fourth Amendment right to privacy in the workplace case law—specifically, "reasonable expectation of privacy" cases—

35

in conducting its analysis.  A person asserting a right to privacy must show that "he has a subjective expectation of privacy . . . that society accepts as objectively reasonable*." Id.* at 257 (quoting *California v. Greenwood*, 486 U.S. 35, 39 (1988)).  The court equated an employee's reasonable expectation of privacy in company property—such as computer files and e-mails— with an employee's reasonable expectation that his or her personal communications over company property will remain confidential for attorney-client privilege waiver purposes.  *Id.* at 257–58 (citing *United States v. Simons*, 206 F.3d 392, 398 & 399 n.8 (4th Cir. 2000) ("no reasonable expectation of privacy in office computer and downloaded Internet files where employer had a policy of auditing employee's use of the Internet, and the employee did not assert that he was unaware of or had not consented to the policy"); *Muick v. Glenayre Elecs.*, 280 F.3d 741, 743 (7th Cir. 2002) ("no reasonable expectation of privacy in workplace computer files where employer had announced that he could inspect the computer"); *Thygeson v. U.S. Bankcorp*, No. CV-03-467, 2004 WL 2066746, at *20 (D. Or. Sept. 15, 2004) ("no reasonable expectation of privacy in computer files and e-mail where employee handbook explicitly warned of employer's right to monitor files and e-mail"); *Kelleher v. City of Reading*, No. Civ. A. 01- 3386, 2002 WL 1067442, at *8 (E.D. Pa. May 29, 2002) ("no reasonable expectation of privacy in workplace e-mail where employer's guidelines 'explicitly informed employees that there was no such expectation of privacy'"); *Garrity v. John Hancock Mutual Life Ins. Co.*, No. Civ. A. 00- 12143, 2002 WL 974676, at *1–2 (D. Mass. May 7, 2002) ("no reasonable expectation of privacy where, despite the fact that the employee created a password to limit access, the company periodically reminded employees that the company e-mail policy prohibited certain uses, the e-mail system belonged to the company, although the company did not intentionally inspect e-mail usage, it might do so where there were business or legal reasons to do so, and the

plaintiff assumed her e-mails might be forwarded to others")).  Other federal district courts have

noted that the *Asia Global* court "looked toward the Fourth Amendment reasonable expectation

of privacy standard to determine the reasonableness of intent that the communication remain

confidential."  *Sprenger v. Rector and Bd. of Visitors of Virginia Tech*, No. 7:07cv502, 2008 WL

2465236, at *3 (W.D. Va. Jan. 17, 2008).

    *Asia Global*'s utilization of right to privacy in the workplace cases in the attorney-client

privilege waiver arena manifested into a four-factor balancing test.  In determining whether an

employee waived the attorney-privileged status of his personal communications transmitted or

stored on company property, a court should ask:

> (1) does the corporation maintain a policy banning personal or other objectionable
> use, (2) does the company monitor the use of the employee's computer or e-mail,
> (3) do third parties have a right of access to the computer or e-mails, and (4) did
> the corporation notify the employee, or was the employee aware, of the use and
> monitoring policies?

322 B.R. at 257.  The objective reasonableness of an employee's intent that his or her personal

communications will remain confidential depends on these four factors.  *Id.* at 259.  The court

found that third parties, such as the company and the trustee, obviously had access to the

Insiders' emails, stating: "[i]n truth, sending a message over the debtor's e-mail system was like

placing a copy of that message in the company files.  Short of encryption, the Insider E-mails

could be reviewed and read by anyone with lawful access to the system."  *Id.*  Yet, the evidence

pertaining to the existence or notice of corporate policies limiting use of corporate computers, or

providing that the company would or could monitor information on the company server, was

insufficient to conclude that, as a matter of law, the use of Asia Global's e-mail system waived

the attorney-client privilege.  *Id.* at 259–61.  The court found that the e-mail policy before it did

not mention Asia Global by name.  *Id.* at 260.  And, the court suggested that if Asia Global

indeed had a policy, warning employees of the policy would have been unnecessary if the Insiders impliedly consented to the policy in some way.  *Id.* at 261.  For example, a flash screen warning users about an employer's right to monitor would have provided adequate notice.  *Id.*

Federal district courts have subsequently applied or referred to *Asia Global*'s test in determining whether employees have waived the attorney-client privilege in their personal communications by using company property—specifically, employer computer and e-mail servers.  *Etkin*, 2008 WL 482281, at *4 n.6; *Sprenger*, 2008 WL 2465236, at *3; *Curto*, 2006 WL 1318387, at *7.

Most of these cases concern companies with electronic communications policies.  *Curto*, 2006 WL 1318387, at *1 (The computer policy in *Curto* provided that "[t]he computers and computer accounts given to employees are to assist them in performance of their jobs. Employees should not have an expectation of privacy in anything they create, store, send, or receive on the computer system.  The computer system belongs to the company and may be used only for business purposes . . . ."); *Etkin*, 2008 WL 482281, at *3 (flash-screen notice at log on); *Sprenger*, 2008 WL 2465236, at *1 (A State electronic communications policy, which applied to university employees, provided that "no user should have any expectation of privacy in any message, file, image, or data created, sent, retrieved, or received by use of the Commonwealth's equipment" and that monitoring could occur "at any time, without notice, and without the user's permission."); *Kaufman*, 2006 WL 1307882, at *4 (policy provided "[t]he Company has the right to access and inspect all electronic systems and physical property belonging to it.  Employees should not expect that any items created with, stored on, or stored within Company property will remain private . . . .").

These cases emphasize that the *Asia Global* four-factor waiver analysis is a fact-specific

inquiry. *Sprenger*, 2008 WL 2465236, at *4 ("These cases turn on the very specific factual situations unique to each case.").   They also refer to the Fourth Amendment reasonable expectation of privacy in the workplace cases.  *Etkin*, 2008 WL 482281, at *4 ("An employee cannot claim a justified expectation of privacy in computer files where the employer owns the computer; the employee uses that computer to obtain access to the internet and e-mail through the employer's network; the employee was explicitly cautioned that information flowing through or stored on computers within the network cannot be considered confidential, and where computer users were notified . . . . " (quoting *United States v. Bailey*, 272 F. Supp. 2d 822, 835 (D. Neb. 2003))); *Sprenger*, 2008 WL 2465236, at *3 (citing *Simons*, 206 F.3d at 398).

In *Sprenger v. Rector and Board of Visitors of Virginia Tech*, the United States District Court for the Western District of Virginia concluded that an employee had not waived the confidential marital communications privilege in personal e-mails by using her employer's computer system.  2008 WL 2465236, at *4.  The claimant was a Virginia Tech employee, and the university incorporated a State electronic communications monitoring policy providing that "no user should have any expectation of privacy in any message, file, image, or data created, sent, retrieved, or received by use of the Commonwealth's equipment" and monitoring can occur "at any time, without notice . . . . " *Id.* at *1.  The court found that the evidence before it was insufficient to adequately conduct an *Asia Global* balancing test.  *Id.* at *4.  Specifically, there was no showing that the claimant "was notified of the Policy by a log-on banner, flash screen, *or employee handbook*" and "whether third parties had a right of access to the e-mails." *Id.* (emphasis added).

In *United States v. Etkin*, decided by the United States District Court for the Southern District of New York, the overriding issue was whether a former employee was on notice that e-

mails sent from his work computer might be read by a third party.  2008 WL 482281, at *3–4.
The employee claimed the confidential marital communications privilege shielded private e-
mails to his wife from disclosure.  The employer's computers flashed notices at log on warning
employees that their e-mails were subject to monitoring.  *Id.* at *3.  The court cited *Asia Global*
for its conclusion that: "[F]ailure to warn the employees of an existing e-mail policy does not
necessarily mean that the employees . . . were not on notice of the e-mail policy.  For example, at
log on, some business computers, including those used by the Court's personnel, warn users
about personal use and the employers' right to monitor."  *Id.* at *4 n.6 (quoting *Asia Global*, 322
B.R. at 261).   The court found the former employee waived the marital communications
privilege by virtue of the company's flash-screen warning.  *Id.* at *4.  It also noted that whether
an employer actually reads an employee's e-mails is irrelevant.  *Id.*

In *Curto v. Medical World Communications, Inc.*, the United States District Court for the
Eastern District of New York found that a former employee's personal documents transmitted to
and from her personal counsel via a company-owned laptop were protected from disclosure by
the attorney-client privilege.  2006 WL 1318387, at *1.  The company had a policy setting forth
that employees should have no expectation of privacy in "anything they created[ed], stored[ed],
sen[t], or receive[d] on the computer system."  *Id.*  The court discussed *Asia Global*, but
ultimately based its decision on a traditional inadvertent disclosure waiver analysis, also a four-
factor balancing test.  *Id.* at *3–4.  It concluded that the former employee took reasonable
precautions in maintaining the confidentiality of her e-mails by sending and receiving them
through her personal e-mail account, *which did not go through the company's servers, as she
worked from home.  Id.*  The court also added a fifth factor or "subfactor" to the traditional
inadvertent waiver test—whether the company enforced its computer policy.  *Id.*  The court

found that the company's lack of enforcement of its computer usage policy "created a false sense of security which lulled employees into believing that the policy would not be enforced." *Id.* at *3, 8.

In *Long v. Marubeni America Corporation*, plaintiffs in a civil rights action against their former employer argued the attorney-client privilege protected e-mails they transmitted on their company computers from disclosure. 2006 WL 2998671, at *1. The defendant employer, on the other hand, argued that the employees had no reasonable expectation of privacy in their personal e-mails and, therefore, the e-mails were not confidential. *Id.* at *2. While employed at the company, the plaintiffs used company-owned computers to e-mail their personal attorneys. *Id.* at *1. They protected their e-mail accounts with private passwords. *Id.* Similar to the company in *Asia Global*, this company also had an electronic communications policy that was incorporated in its employee handbook. *Id.* The handbook provided that: "all communications and information transmitted by, received from, created or stored in MAC's automated systems (whether through word processing programs, database programs, e-mail, the internet or otherwise) are company records and MAC'S property." *Id.* In addition, the company had the right to monitor its computer systems, and employees had "no right of personal privacy in any matter stored in, created, received, or sent over the e-mail, voice mail, word processing, and/or internet systems" provided by the company. *Id.* The court reviewed the e-mails in camera, and found that several of the e-mails were in fact "attorney-client communications or attorney-client-related communication*." Id.* at *3. Yet, they were not confidential communications and, as a consequence, not privileged, as they were transmitted on the company's computer system and subject to the electronic communications policy. *Id.* The court emphasized that the company's electronic communication guidelines were clear and unambiguous: employees were to have no

41

expectation of privacy in electronic information stored, sent, or received on company property, and the company could monitor employees' communications at any time. *Id.* The court held that the plaintiffs disregarded these rules voluntarily and, as a consequence, "stripped" their e-mails of "the confidential cloak with which they claim[ed] those communications were covered." *Id.* It was unreasonable for the plaintiffs to believe that their e-mails were confidential because they "knew or should have known" of the policy. *Id.* The record established that all employees received the policy on an annual basis, one plaintiff helped prepare the policy, and the other plaintiff held a high position at the company and, therefore, presumably knew of the policy. *Id.*

This Court adopts the *Asia Global* four-factor balancing test to determine whether Speer waived any privilege he may have had in his personal e-mails transmitted via the Debtor's computer and e-mail servers. It must be emphasized that it is Speer's burden, even in this e-discovery context, to prove that he reasonably expected his e-mails would remain confidential and, therefore, that he did not waive the attorney-client privilege.[15] He bears the burden of proving absence of waiver. *Grand Jury Proceedings*, 517 F.2d at 670; *Asia Global*, 322 B.R. at 255 ("The person asserting the privilege has the burden of proving that the communication is privileged, and that the privilege was not waived."). Speer must negate *Asia Global*'s four factors with competent evidence and prove that he had a reasonable expectation of privacy in his personal e-mails. *See Asia Global*, 322 B.R. at 255; *Robinson*, 121 F.3d at 976 ("The assertor of the privilege must have a reasonable expectation of confidentiality, either that the information disclosed is intrinsically confidential, or by showing that he had a subjective intent of confidentiality."). After applying *Asia Global* and its progeny, the evidence in this dispute strongly tips in the Trustee's favor.

---

[15] *Supra* Conclusion of Law D.

i. *Did the Debtor Have a Policy Banning Personal or Other Objectionable Use*?

*Asia Global*'s first factor asks whether the corporation maintained a policy banning personal or other objectionable use.   322 B.R. at 257.   The evidence before the Court unambiguously shows that the Debtor had a policy banning confidential communications on its computer server and prohibiting certain uses of its system.  [Finding of Fact No. 17.]   At the Hearing, Boothe testified that the Debtor did in fact have an electronic communications policy, and the Court admitted this policy into evidence.  [Finding of Fact No. 17.]  The Debtor defined electronic communications as "e-mails, voice-mail, corporate Web sites and company Internet use."  [Finding of Fact No. 17; Trustee's Ex. No. 6.]  This policy was binding on all employees and incorporated in the Debtor's Employee Handbook.  [Finding of Fact No. 17; Trustee's Ex. No. 6]  It specifically provided: *Employees are NOT to disseminate any confidential information over the company's system.*  [Finding of Fact No. 17; Trustee's Ex. No. 6] (emphasis added).  It also warned that certain computer uses were prohibited.  For example:

> Employees are **NEVER** permitted to participate in chat rooms on company equipment during business hours.
>
> Employees are **NOT** authorized to send, circulate, [sic] receive discriminatory or defamatory statements, profanity, or any statements or jokes that could be considered sexually harassing.
>
> Employees are **NOT** to install or view any software or diskette, personal or business related that does not have prior approval from the President.
>
> Employees are to be aware that although the Company has installed software with virus detection, external e-mail messages with attachments may contain a virus. Suspicious external e-mail attachments should not be opened without first contacting the Administrative Coordinator.

[Finding of Fact No. 17.]

Unlike the equivocal corporate electronic communications policy in *Asia Global*, the Debtor's Electronic Communications Policy unquestionably was in force and applied to all

43

"**ROYCE HOMES L.P.**" employees. [Finding of Fact No. 17; Trustee's Ex. No. 6.] The heading of the Electronic Communications Policy section includes the Debtor's (i.e. Royce's) name in bold and all capitalized letters. As exhibited above, the prohibited computer uses also are in bold and all capitalized letters, emphasizing that the Debtor's policy was absolute. [Finding of Fact No. 17; Trustee's Ex. No. 6.] Although Speer's counsel adduced generic testimony from Boothe that Speer was not an "employee" of the Debtor, [Tape Recording, 1/19/11 Hearing at 2:15:17 p.m.], the testimony on this point is not conclusive. First, the Trustee's and Boothe's testimony leaves this Court to conclude that Speer was a "key employee" of the Debtor. [Finding of Fact No. 4.] Second, the Trustee gave testimony that Speer was receiving a salary of approximately $150,000 per month from the Debtor, [Tape Recording, 1/19/11 Hearing at 3:25:03 p.m.], and such a regular monthly payment is at least one indication that Speer was an employee of the Debtor. *See Simpson v. Ernst & Young*, 100 F.3d 436, 443–44 (6th Cir. 1997) (holding courts should look to the particular circumstances of the case at hand, rather than focusing on labels, in determining whether an individual is a partner or employee of an organization) (citing *Fountain v. Metcalf, Zima & Co.*, 925 F.2d 1398 (11th Cir. 1991)). Moreover, Speer himself gave no testimony that he was not an employee; once again, Speer has failed to meet his burden. *See Hodges, Grant & Kaufman*, 768 F.2d at 721; *Grand Jury Proceedings,* 517 F.2d at 670. For all of these reasons, the Court concludes that Speer was indeed an "employee" of the Debtor. And, because Speer was an employee of the Debtor, the Court finds that he was subject to the Debtor's Electronic Communications Policy.

ii. *Did the Debtor Monitor the Use of Speer's Computer or E-mail?*

The second factor of *Asia Global*'s waiver test asks whether the company monitors the use of the employee's computer or e-mail. 322 B.R. at 257. Speer offered no evidence on this

point.  The Debtor's Electronic Communications Policy, introduced by the Trustee and admitted by the Court, emphasizes the Debtor's absolute control and power over its electronic communication system.  [Finding of Fact No. 17; Trustee's Ex. No. 6.]  Employees of the Debtor were to have no expectation of privacy in their personal communications whatsoever.  Specifically, the Policy provides: "All electronic communications are the property of the Company and *all information contained on any electronic system belongs to the company and nothing on them will be considered private*."  [Finding of Fact No. 17; Trustee's Ex. No. 6] (emphasis added).  Furthermore, at any point, the Debtor could access all employees' personal communications, with or without advance notice.  [Finding of Fact No. 17; Trustee's Ex. No. 6.]  The Policy cautions employees that: "Employees may conduct limited, reasonable and appropriate communications on the company's electronic communication system *with the understanding that personal communications may be accessed, viewed, read or retrieved by a company Manager or employee.*"  [Finding of Fact No. 17; Trustee's Ex. No. 6] (emphasis added).  Although the Trustee introduced no evidence on actual enforcement of the Debtor's monitoring policy, whether the Debtor actually reads an employee's e-mails is irrelevant.  *Etkin*, 2008 WL 482281, at *4 ("Thus, it is irrelevant that the Government has not established that the NYSP actually read Defendant's email.").  The core principle embraced by the *Asia Global* test is "reasonable expectation of privacy."  The Debtor's guidelines on monitoring were so explicit and straightforward that no employee could reasonably believe the Debtor would not or could not view his or her personal e-mails.  *Long*, 2006 WL 2998671, at *3 (company's electronic communications policy "clear[ly]" and "unambiguous[ly]" cautioned employees that employees would not enjoy privacy when using company-owned computers); *Etkin*, 2008 WL 482281, at *4 ("An employee cannot claim a justified expectation of privacy in computer files where the

45

employer owns the computer; the employee uses that computer to obtain access to the internet and e-mail through the employer's network; the employee was explicitly warned that information flowing through or stored on computers within the network cannot be considered confidential, and where computer users were notified that network administrators and others were free to view data downloaded from the internet." (quoting *Bailey*, 272 F. Supp. 2d at 835)). Moreover, it is Speer's burden to prove the Debtor did not monitor its computer or e-mail system—not the Trustee's. Speer failed to do so.

### iii. *Did Third Parties Have a Right to Access Speer's Computer or E-mails?*

The third prong of the *Asia Global* test is whether third parties had a right to access the computer or e-mails. 322 B.R. at 257. As in *Asia Global*, third parties undeniably had access to Speer's e-mails by virtue of their mere placement on the Debtor's server. *Id.* at 259. As its Electronic Communications Policy highlighted, the Debtor could monitor Speer's e-mails at any time. [Finding of Fact No. 17; Trustee's Ex. No. 6.] The Trustee, who, at the inception of this Chapter 7 case, took title and control of all of the Debtor's assets (including the Debtor's computers and servers) also had unfettered access to Speer's e-mails. [Finding of Fact Nos. 38 & 41.] Specifically, the Trustee, *on his own*, recovered one of the Debtor's servers. [Finding of Fact No. 41; Tape Recording, 1/19/11 Hearing at 3:08:55 p.m.] Furthermore, Speer took affirmative steps to grant access to his e-mails to third parties.[16] Speer gave Boothe and Gresham access to his e-mails without qualification.[17] [Finding of Fact Nos. 26–32.] Speer's counsel adduced testimony from Boothe that Speer's e-mails were password-protected, implying Speer's intent to limit access to his personal communications. [Finding of Fact No. 18; Tape

---

[16] Third parties also had access to Speer's e-mails in the traditional sense, and this Court will discuss traditional waiver in its next Conclusion of Law. *Infra* Conclusion of Law G.2. & 3.

[17] *Infra* Conclusion of Law G.2.

Recording, 1/19/11 Hearing at 2:52:21 p.m.]   The Court finds that the Debtor's explicit notification in its Electronic Communications Policy that all personal communications were corporate property overrode Speer's false and unreasonable sense of security.   *Id.* at 258 (citing *Garrity*, 2002 WL 974676, at *1–2 ("no reasonable expectation of privacy where, despite the fact that the employee created a password to limit access, the company periodically reminded employees that the company e-mail policy prohibited certain uses, the e-mail system belonged to the company, although the company did not intentionally inspect e-mail usage, it might do so where there were business or legal reasons to do so, and the plaintiff assumed her e-mails might be forwarded to others")).

### iv. *Did the Debtor Notify Speer, or Was He Aware, of the Debtor's Use and Monitoring Policies?*

The fourth question relevant to this analysis is whether the debtor entity notified the employee, or was he aware, of the debtor's use and monitoring policies.   *Id.* at 257.   Although the Trustee did not provide the Court with evidence that the Debtor notified Speer or other employees of its Electronic Communications Policy, *Asia Global* and *Etkin* stand for the proposition that actual or direct notification to employees is unnecessary if the corporation has a communications policy that is memorialized.   *Etkin*, 2008 WL 482281, at *4; *id.* at 261.   The *Sprenger* court suggested that an employee handbook could provide an employee with sufficient notice of the company's computer use and monitoring policy.   2008 WL 2465236, at *4.   The *Asia Global* court stated that the failure of Asia Global to warn its employees of its policy did not mean that the employees were not on notice of the policy.   322 B.R. at 261.   Moreover, it is Speer's burden to prove absence of waiver.   He offered no evidence on *his perception or awareness* of the policy whatsoever, as he did not appear in court to testify.   [Finding of Fact No. 13.]   The Court therefore imputes notice to Speer, as he was a key employee of the Debtor and

surely knew what the Debtor's Electronic Communications Policy stated.  *See Long*, 2006 WL 2998671, at *3 (court imputed knowledge of company's electronic communications policy to claimant, who was the company's former senior vice president and general manager; this claimant, as well as the other claimant, "knew or should have known" of the policy).

In the dispute at bar, there is sufficient evidence for the Court to apply *Asia Global*'s waiver test.  For the foregoing reasons, the Court concludes that Speer has waived the attorney-client privilege by transmitting and receiving personal e-mails on the Debtor's computer and e-mail servers.  It was unreasonable for Speer to believe his e-mails would remain confidential.

Furthermore, as this Court has suggested, there is a separate and independent reason to sustain a finding of waiver.  Speer also waived the attorney-client privilege in the traditional sense by voluntarily disclosing his e-mail communications to Boothe and Gresham without qualification.

   2. Speer Voluntarily Waived the Attorney-Client Privilege by Intentionally Providing Boothe and Gresham Access to His E-mails Without Qualification.

The evidence conclusively establishes that Speer intentionally gave Gresham and Boothe access to his e-mails.  [Finding of Fact Nos. 26–32.]  At the Hearing, Boothe testified that she was hired by Speer, individually, to print, review, and sort all of his personal e-mails stored on the Debtor's computer in connection with the Kopecky litigation.  [Finding of Fact Nos. 24–25.]  She has no legal education.  [Finding of Fact No. 15.]  Before she could begin her task, Speer directed Gresham to take Speer's computer over to Boothe's home and transfer his e-mails onto her hard drive.  [Finding of Fact No. 26.]  Gresham was neither an attorney nor a legal assistant.  [Finding of Fact No. 26.]  Given these circumstances, the Court finds that Speer's actions were overtly inconsistent with the confidentiality necessary to maintain the privileged nature of one's attorney-client communications.  Under a traditional waiver analysis, Speer waived the attorney-

client privilege.  Speer has failed to prove that Boothe or Gresham were necessary parties for purposes of the attorney-client privilege.

The Court has extensively reviewed the law of waiver in the context of the attorney-client privilege.[18]  Generally, voluntary disclosure of one's privileged communications to third parties waives the attorney-client privilege, as voluntary disclosure is inconsistent with the confidential nature of the attorney client relationship.  *Alldread*, 988 F.2d at 1434; *Hartford Fire Ins.*, 109 F.R.D. at 327.  Voluntarily disclosing one's privileged communications is generally intentional.  *Alpert*, 267 F.R.D. at 210.  Disclosure to a party who is necessary for the transmission of the attorney-client communication or those to whom disclosure furthers the rendition of legal services does not destroy or waive the attorney-client privilege.  3 WEINSTEIN'S FEDERAL EVIDENCE, § 503.15[1] (2010).  These parties are referred to as agents for purposes of the attorney-client privilege.  *Hodges, Grant & Kaufman*, 768 F.2d at 721 (suggesting attorney-client privilege would have been preserved if third party was claimant's agent, as "the attorney-client privilege might properly be extended" because third party would have "in effect" been claimant's "alter ego"); *United States v. Adlman*, 68 F.3d 1495, 1499 (2d Cir. 1995) ("Under certain circumstances . . . the privilege for communication with attorneys can extend to shield communications to others when the purpose of the communication is to assist the attorney in rendering advice to the client."); *Commonwealth v. Senior*, 433 Mass. 453, 457 (2001) (presence of a nonnecessary agent during the attorney-client communication destroys the attorney-client privilege).  The Fifth Circuit has also held that the attorney-client privilege is not waived if the communications at issue are disclosed to a party with a common legal interest—the common legal interest extension of the attorney-client privilege.  *Santa Fe*, 272 F.3d at 710; *Hodges,*

---

[18] *Supra* Conclusion of Law C.2.

*Grant & Kaufman*, 768 F.2d at 721 ("The privilege is not . . . waived if a privileged communication is shared with a third person who has a common legal interest with respect to the subject matter of the communication.").  The two types of communications protected under the common legal interest doctrine are: (1) communications between co-parties in actual litigation and their counsel; and (2) communications between potential co-parties and their counsel where litigation has not yet been actually initiated, but is nevertheless reasonably anticipated. *Santa Fe*, 272 F.3d at 710–11.

Here, Speer voluntarily disclosed his personal e-mail communications to third parties—Boothe and Gresham.  Everything Speer did in regards to Boothe and Gresham was wholly inconsistent with an intent that his communications remain confidential.  The Court still is unaware of Gresham's job title or relationship to Speer.  Testimony was adduced at the Hearing that he was neither an attorney nor a paralegal.  [Finding of Fact No. 26.]  In any event, Boothe's testimony was clear: Gresham had complete control and possession over Speer's computer.  Undoubtedly, he transported the computer to Boothe's home in some way.  He then proceeded to transfer Speer's e-mails onto Boothe's computer.  [Finding of Fact No. 26.]

Speer's intent that Boothe have unqualified access to his e-mails was clearly established through Boothe's testimony.  Speer personally gained from disclosing his e-mails to Boothe in that she essentially did the work that Speer's lawyer should have done in sorting e-mails for purposes of discovery.  [Finding of Fact No. 25.]  She performed this task at home.  [Finding of Fact No. 27.]  Evidence on the privacy of Boothe's home or workspace at home was not introduced at the Hearing.  After her task was complete, Boothe was informed that the e-mails were no longer necessary.  [Finding of Fact No. 30.]  Boothe then placed the e-mails in the Phelps Dunbar recycling bin.  [Finding of Fact No. 31.]  Phelps Dunbar is a third-party entity.

[Finding of Fact No. 21.]  Testimony about the secure nature of the Phelps Dunbar recycling bin was not adduced at the Hearing.  [Tape Recording, 1/19/11 Hearing at 2:55:30 p.m.]  Moreover, until this day, Speer has not requested that Boothe return the computer or delete the e-mails off of her hard drive.  [Finding of Fact No. 32.]

Speer also failed to prove that Gresham or Boothe were necessary agents for attorney-client privilege purposes.  Again, the party invoking the attorney-client privilege has the burden of proving every element of the attorney-client privilege, including confidentiality and the absence of waiver.[19]  This burden extends to each and every document that an individual claims is privileged.  In the dispute at bar, Gresham is the epitome of an unnecessary third party.  There is no evidence in the record even hinting that he was an agent or employee of Speer.

At first blush, Boothe's relationship to Speer may lead one to conclude that she was his agent, but the real question is: *Was Boothe Speer's agent for purposes of the attorney-client privilege?*  There is a complete lack of evidence concerning Boothe's role in *transmitting* each and every e-mail she sorted or how she participated in the preparation of each e-mail.  Disclosure to *necessary* parties does not destroy the privilege.  How was she *necessary* to the transmission of Speer's e-mails?  Boothe merely testified to her general role as Speer's paralegal, a position she held while employed by the Debtor; whereas, she reviewed and collated Speer's e-mails *after* she had resigned working for the Debtor.  [Finding of Fact No. 15.]  This sparse testimony in no way established an absence of waiver.  Speer could have easily appeared in court and testified as to Boothe's specific involvement with these e-mails at the time of their creation.  He chose not to do so, and thus failed to meet his burden of proof.

Although Speer's counsel made no oral argument that Speer shared a common legal

---

[19] *Infra* Conclusion of Law D.

interest with the Debtor, Boothe, or Gresham, this argument was briefly raised in Speer's response to the Motion to Compel. *Santa Fe*, 272 F.3d at 710 (Santa Fe failed to carry its burden of showing that its communications met the established criteria for protection under the common legal interest privilege.). Even if Speer's counsel had argued that the common legal interest doctrine shielded Speer's e-mails from disclosure, he presented no evidence on this point. For example, no common defense agreement was produced. *Id.* at 709 n.5 ("The defendants did nothing to show that the communications to third persons were made in anticipation of a common defense.").

In sum, Speer has waived the attorney-client privilege by voluntarily disclosing his e-mails to unnecessary parties, Boothe and Gresham. It is also a well settled principle that "[w]hen a party waives the attorney-client privilege, it waives the privilege as to all communications that pertain to the same subject matter of the waived communication." *Microtune, Inc.* 258 F.R.D. at 317 (citing *SEC v. Brady*, 238 F.R.D. 429, 441 (N.D. Tex. 2006)). At the Hearing, there was extensive discussion concerning the disclosure of Speer's e-mails to the Trustee. [Finding of Fact No. 41.] Applying the aforementioned principle, one could easily conclude waiver as to one, waiver as to all. Yet, the Court finds there is an independent basis for concluding that Speer has waived the attorney-client privilege as to the e-mails produced to the Trustee.

3. Speer Has Waived the Attorney-Client Privilege by Voluntarily Disclosing, Through Boothe, His E-mails to the Trustee.

At the Hearing, Boothe testified that she warned Speer on two occasions that the Trustee was seeking the contents of her computer. [Finding of Fact Nos. 34 & 36.] She stated she "couldn't help but know" Speer's e-mails were on her hard drive, as she had spent countless hours sorting and reviewing each and every e-mail. [Finding of Fact No. 37.] Speer did not object to the Trustee's taking possession of the computer's information nor did he ask Boothe to

segregate or destroy his e-mails.  [Finding of Fact No. 36.]  Speer's failure to object to the Trustee's confiscation of the computer data shows the intent on his part to voluntarily disclose his e-mails to the Trustee.  As such, he has waived the attorney-client privilege as to his personal e-mails by virtue of his failure to prevent Boothe from disclosing his e-mails to the Trustee.

As the claimant, Speer bears the burden of proving that *he* did not voluntarily disclose his e-mails to the Trustee through Boothe.  He did not testify on this—or any other—point.  His actions, as described by Boothe, were consistent with voluntary disclosure.  It is fair to assume that he intended to make his e-mails available to the Trustee, as he had ample opportunity to object to their disclosure, but did not do so.  On this basis, Speer waived the attorney-client privilege.

## V. CONCLUSION

It is clear that Speer has failed to discharge his burden of proving that the attorney-client privilege attaches to his e-mails and that the privilege was not waived.  The Fifth Circuit requires that claimants of the attorney-client privilege prove the privilege applies to each and every document claimed as privileged and that every essential element of the definition of the privilege is met.  Rather than providing this Court with precise and competent evidence to meet his burden, Speer introduced an utterly deficient privilege log, and generally asserted the privilege. This Court will not accept Speer's blanket assertions of the privilege at face value.

Alternatively, assuming the privilege attached to Speer's communications, he failed to prove that the privilege was not waived.  The record shows that Speer intentionally gave unnecessary third parties (Boothe and Gresham) unqualified access to his personal e-mails.  The Trustee also had unfettered access to Speer's e-mails.  Moreover, Speer did not have a reasonable expectation that his e-mails would remain confidential by virtue of his use of the

Debtor's computer and e-mails servers.   The Debtor's Electronic Communications Policy explicitly banned confidential communications over its computer system, and cautioned employees that the Debtor could access, view, read, or retrieve employees' personal communications at any time.

Based upon such circumstances, the Court concludes that the communications listed in Speer's second amended privilege log must be produced to the Trustee.

An order consistent with this Opinion will be entered on the docket simultaneously with the entry on the docket of this Opinion.

Signed on this 11th day of March, 2011.

Jeff Bohm
United States Bankruptcy Judge